UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
SPRINGUARD TECHNOLOGY                )
GROUP INC.,                                          )
                                                        )      **ORAL ARGUMENT REQUESTED**
          Plaintiff,                                 )
                                                        )        Case No. 08-cv-12119-RWZ
          v.                                         )
                                                        )
UNITED STATES PATENT AND            )
TRADEMARK OFFICE; and JOHN J.     )
DOLL, in his official capacity as Acting   )
Director of the United States Patent and  )
Trademark Office,                              )
                                                        )
          Defendants.                             )
_____ )


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Donald R. Steinberg (BBO #553699)
Donna M. Meuth (BBO #645598)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 (fax)

Brian M. Boynton (*pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
(202) 663-6363 (fax)

*Attorneys for Plaintiff*
*SpringGuard Technology Group Inc.*

Date:  June 12, 2009

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

LIST OF EXHIBITS TO THE DECLARATION OF DONALD R. STEINBERG.................. v

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

ARGUMENT ..................................................................................................... 7

I.    THE PTO'S IMPUTATION OF JORDAN'S CONDUCT TO SPRINGUARD
      WAS ARBITRARY AND CAPRICIOUS .................................................... 8

      A.    The PTO's Decision Was Inconsistent With Its Past Decisions
            Finding Unavoidable Delay In Cases Of Attorney Misconduct ........................ 8

      B.    The PTO's Failure Even To Consider An Exception To The *Link*
            Rule Was Arbitrary and Capricious .................................................. 10

      C.    It Was Arbitrary and Capricious Not To Recognize An Exception
            To The *Link* Rule In The Circumstances Of This Case ..................................... 14

II.   THE PTO'S IMPOSITION OF AN INSURMOUNTABLE EVIDENTIARY
      BURDEN WAS ARBITRARY AND CAPRICIOUS.................................................. 17

III.  ANY SUGGESTION THAT SPRINGUARD ITSELF WAS NOT DILIGENT
      MUST BE REJECTED ............................................................................... 18

CONCLUSION ................................................................................................. 20

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

*Associated Marine Equipment LLC v. Jones*,
    301 Fed. Appx. 346, 350 (5th Cir. 2008).........................................................................12

*Boughner v. Secretary of Health, Education & Welfare*,
    572 F.2d 976 (3d Cir. 1978)...............................................................................11, 12

*Brooks v. Walker*,
    82 F.R.D. 95 (D. Mass. 1979)..............................................................................11

*Burandt v. Dudas*,
    528 F.3d 1329 (Fed. Cir. 2008).............................................................................7

*California Medical Products, Inc. v. Tecnol Medical Products, Inc.*,
    921 F. Supp. 1219 (D. Del. 1995)......................................................................19, 20

*Carter v. Albert Einstein Medical Center*,
    804 F.2d 805 (3d Cir. 1986)................................................................................11

*Community Dental Services v. Tani*,
    282 F.3d 1164 (9th Cir. 2002) ............................................................................11

*Douglas v. Manbeck*,
    21 U.S.P.Q.2d 1697 (E.D. Pa. 1991), *aff'd* 1992 WL 162547 (Fed. Cir. 1992)..........15, 19

*FCC v. Fox Television Stations, Inc.*,
    129 S. Ct. 1800 (2009).....................................................................................8, 18

*Florida Municipal Power Agency v. FERC*,
    411 F.3d 287 (D.C. Cir. 2005)............................................................................13

*Frizelle v. Slater*,
    111 F.3d 172 (D.C. Cir. 1997)............................................................................18

*Fuller v. Quire*,
    916 F.2d 358 (6th Cir. 1990) .............................................................................11

*Gas Transmission Northwest Corp. v. FERC*,
    363 F.3d 500 (D.C. Cir. 2004)............................................................................13

*Green Country Mobilephone, Inc. v. FCC*,
    765 F.2d 235 (D.C. Cir. 1985)............................................................................13

*Hooper v. NTSB*,
    841 F.2d 1150 (D.C. Cir. 1988) ......................................................................13

*KPS & Associates, Inc. v. Designs By FMC, Inc.*,
    318 F.3d 1 (1st Cir. 2003) ............................................................................11

*Kelley v. Merit System Protection Board*,
    241 F.3d 1368 (Fed. Cir. 2001) ...................................................................13

*L.P. Steuart, Inc. v. Matthews*,
    329 F.2d 234 (D.C. Cir. 1964) .....................................................................11

*Laclede Gas Co. v. FERC*,
    873 F.2d 1494 (D.C. Cir. 1989) ...................................................................10

*Link v. Wabash Railroad Co.*,
    370 U.S. 626 (1962) ............................................................................. *passim*

*Lising v. INS*,
    124 F.3d 996 (9th Cir. 1997) .......................................................................15

*Massachusetts Department of Education v. United States Department of Education*,
    837 F.2d 536 (1st Cir.  1988) ...................................................................9, 10

*Millman v. USPTO*,
    257 Fed. Appx. 307 (Fed Cir. 2007) ...........................................................19

*Motor Vehicle Manufacturers Association of the U.S., Inc. v. State Farm Mutual*
    *Automobile Insurance Co.*, 463 U.S. 29 (1983) ....................................7, 8, 10

*NLRB v. Beverly Enterprises-Massachusetts, Inc.*,
    174 F.3d 13 (1st Cir. 1999) ..........................................................................10

*Nebraska v. EPA*,
    331 F.3d 995 (D.C. Cir. 2003) .....................................................................15

*New York State Bar Association v. FTC*,
    276 F. Supp. 2d 110 (D.D.C. 2003) .............................................................13

*PPL Wallingford Energy LLC v. FERC*,
    419 F.3d 1194 (D.C. Cir. 2005) ...................................................................17

*R.R. Donnelley & Sons Co. v. Dickinson*,
    123 F. Supp. 2d 456 (N.D. Ill 2000) ...........................................................19

*Ray v. Lehman*,
    55 F.3d 606 (Fed. Cir. 1995)................................................................14

*Seven Elves, Inc. v. Eskenazi*,
    635 F.2d 396 (5th Cir. 1981) ........................................................11, 12

*Smith v. Mossinghoff*,
    671 F.2d 533 (D.C. Cir. 1982)............................................................14

*United States v. 6 Fox Street*,
    480 F.3d 38 (1st Cir. 2007)..................................................................14

## STATUTES & RULES

5 U.S.C. § 706(2) ...........................................................................................7

35 U.S.C. § 41(b) ...........................................................................................3

35 U.S.C. § 41(c)(1) ............................................................................. *passim*

35 U.S.C. § 41(c)(2)    ..................................................................................15

35 U.S.C. § 133...............................................................................10, 12, 14, 19

37 C.F.R. § 1.362(d) ......................................................................................3

37 C.F.R. § 1.366(a).....................................................................................15

Federal Rule of Civil Procedure 60(b)(6) ...............................11, 12, 14, 15

## MISCELLANEOUS

H.R. Rep. No. 97-542 (1982), *reprinted in* 1982 U.S.C.C.A.N. 765 .............................................1

*In re Lonardo*,
17 U.S.P.Q.2d 1455 (Comm'r Pat. & Trademarks 1990)............................12, 13, 14, 19

*In re Patent No. 5,575,606* (Sept. 21, 2005) (Ex. 3)....................................7, 18

*In re Patent No. 5,455,569* (Mar. 4, 2003) (Ex. 4) .....................................7, 8, 18

*In re Patent No. 6,160,836* (Apr. 2, 2007) (Ex. 5)....................................8, 16

*In re Patent No. 5,125,742* (Feb. 25, 1999) (Ex. 6)........................................9

*In re Patent No. 6,000,448* (Mar. 21, 2006) (Ex. 7) .................................................................9, 18

Manual of Patent Examining Procedure § 407 .........................................................................16

**LIST OF EXHIBITS TO THE DECLARATION OF DONALD R. STEINBERG**

Notice of Removal from the Register of Patent Attorneys and Agents (Jan. 7, 2003) (Ex. B to SprinGuard's Complaint) ........................................................ Ex. 1

Notice of Reinstatement to the Register of Patent Attorneys and Agents (Apr. 20, 2004) (Ex. C to SprinGuard's Complaint) ................................................... Ex. 2

In re Patent No. 5,575,606 (Sept. 21, 2005) (together with petitions filed Apr. 11, 2005 and Sept. 25, 2003) ................................................................. Ex. 3

In re Patent No. 5,455,569 (Mar. 4, 2003) (together with petition filed January 7, 2003)................................................................................ Ex. 4

In re Patent No. 6,160,836 (Apr. 2, 2007) ............................................... Ex. 5

In re Patent No. 5,125,742 (Feb. 25, 1999) (together with petition filed Aug. 12, 1998) .......................................................................... Ex. 6

In re Patent No. 6,000,448 (Mar. 21, 2006) (together with petition filed Feb. 9, 2006) ........................................................................... Ex. 7

## INTRODUCTION

This case presents an unusually clear example of the kind of "inequitable loss of patent rights" that Congress enacted 35 U.S.C. § 41(c)(1) to prevent.  H.R. Rep. No. 97-542, at 8 (1982), *reprinted in* 1982 U.S.C.C.A.N. 765.  SprinGuard Technology Group Inc. ("SprinGuard") lost its sole patent and principal asset because its patent attorney, Richard Jordan, failed to make a statutorily required "maintenance fee" payment.  SprinGuard relied on Jordan—who had previously proved dependable—to take all steps necessary to maintain its patent, including paying maintenance fees.  But sometime after the patent was issued, Jordan abandoned his representation of SprinGuard without giving any notice.  He failed to pay the maintenance fee, to notify SprinGuard that the fee was due, or even to forward the relevant notices from the Patent and Trademark Office ("PTO").  Indeed, it appears that during this period Jordan ceased the practice of law altogether:  The PTO removed him from the Register of Patent Attorneys and Agents, and the Massachusetts Bar eventually suspended his license.

As soon as SprinGuard learned that its patent had lapsed, it filed a petition asking the PTO to reinstate the patent under 35 U.S.C. § 41(c)(1) on the ground that the late payment of the maintenance fee had been "unavoidable."  SprinGuard made extraordinary efforts to locate Jordan—including hiring two private investigators—and ultimately learned that he had ceased practicing law.  Nonetheless, the PTO dismissed SprinGuard's petition and denied rehearing on the grounds (1) that SprinGuard was bound by the consequences of Jordan's conduct and (2) that it had the burden of demonstrating that Jordan (who had proved to be unreachable) had acted reasonably by calendaring the due date for the SprinGuard fees in a "docketing system."  Because both of these grounds were arbitrary and capricious, the PTO's denial of SprinGuard's petition should be vacated under the Administrative Procedure Act ("APA").

*First*, the PTO's conclusion that SpringGuard was bound by the consequences of its counsel's misconduct was arbitrary and capricious in a number of respects. In rejecting SpringGuard's petition, the PTO applied a strict *per se* rule that a client is always bound by the acts and omissions of its attorney. But in prior cases—including one with striking parallels to this case—the PTO made no mention of this rule and found unavoidable delay despite attorney misconduct. The PTO's failure to explain its departure from these precedents renders its decision here arbitrary and capricious.

Moreover, most courts hold that a client is *not* bound by its attorney's errors where, as here, the attorney completely abandoned the attorney-client relationship or committed gross negligence. The PTO's unexplained failure even to consider adopting this exception was arbitrary and capricious—particularly because the PTO itself has relied on similar precedents in recognizing a different exception to its *per se* rule, and had specifically left open the possibility of recognizing a "gross negligence" exception as well.

In any event, even if the PTO had attempted to explain its decision, it still would have been arbitrary and capricious to hold SpringGuard accountable for Jordan's misconduct. The PTO's *per se* rule penalizing clients for their lawyers' errors cannot be squared with the Office's obligation to conduct "case-by-case" inquiries under § 41(c)(1). And in light of Jordan's total abandonment of SpringGuard and the fact that the PTO itself had removed Jordan from the list of registered patent attorneys before SpringGuard's patent expired, the PTO should have recognized an exception here.

*Second*, the PTO's unreasonable evidentiary demands were arbitrary and capricious. Although the PTO acknowledged that Jordan had intentionally frustrated SpringGuard's diligent attempts to contact him, the PTO nonetheless held that SpringGuard could obtain relief only if it

produced a declaration from Jordan explaining the circumstances surrounding his failure to pay the maintenance fee.  The PTO wholly failed to offer a reasoned explanation for this insurmountable evidentiary burden, which is contrary to the PTO's own precedent and Congress's intent that the "unavoidable delay" standard be implemented through an equitable inquiry taking into account all of the relevant facts and circumstances.

Because SpringGuard should not be held accountable for Jordan's actions, it is entitled to relief under § 41(c)(1) as long as its own actions were diligent.  And SpringGuard's diligence cannot plausibly be questioned:  It reasonably relied on its counsel to pay the required maintenance fees, thoroughly investigated as soon as it had any reason to suspect that something was amiss, and then acted promptly to restore its rights once it learned that its patent had expired.

## BACKGROUND

Patent maintenance fees are governed by 35 U.S.C. § 41(b).  Fees are due 3.5, 7.5, and 11.5 years after a patent is issued, and each fee must be paid within a one-year window beginning 6 months before the due date and ending at the expiration of a 6-month grace period following the due date.  *Id.*; 37 C.F.R. § 1.362(d).  If one of the required fees is not paid, the patent expires at the end of the relevant grace period.  35 U.S.C. § 41(b).  But the PTO may accept a late payment and restore lost patent rights at any time if "the delay is shown to the satisfaction of the Director to have been unavoidable."  *Id.* § 41(c)(1).

Plaintiff SpringGuard is the owner by assignment of U.S. Patent No. 5,862,529 ("the '529 patent").  Compl. ¶ 5; Administrative Record 293 (hereinafter cited as "A___").  The '529 patent covers a unique and highly effective design for ensuring that lenses in eyeglasses remain in the frame on impact.  *See* Compl., Ex. A.  SpringGuard's patented technology, which provides unparalleled eye protection, is currently used in sports goggles, industrial safety glasses, and children's glasses.

The '529 patent was issued on January 26, 1999 to inventors Donald E. Moodie and Paul F. Vinger, SpringGuard's shareholders and officers. Compl. ¶ 17; A001, A293, A295. It was the first and only U.S. patent retained by SpringGuard or its owners, who were unfamiliar with the PTO's procedures. Compl. ¶ 28; A295. Accordingly, SpringGuard relied on its attorney, Richard Jordan, to take all steps necessary to obtain and maintain the patent, including ensuring timely payment of maintenance fees. A295-A297, A335-A336. To this end, SpringGuard granted Jordan a power of attorney authorizing him to prosecute a patent application, "to receive the patent," and "to transact all business in the [PTO] connected therewith." Compl. ¶¶ 19-21; A041.

Jordan initially fulfilled these responsibilities reliably, successfully prosecuting the patent application and paying the issue fee on SpringGuard's behalf. A293. At some point between the issuance of the patent and the date when the first maintenance payment became due, however, Jordan abandoned his representation of SpringGuard. The first maintenance payment was due on July 28, 2002, and the 6-month grace period ended on January 26, 2003. A360. But despite the fact that the PTO sent Jordan a reminder notice on August 13, 2002, he failed to make the payment himself, to notify SpringGuard that the payment was due, or to forward the PTO's notice to SpringGuard. A295-A296. And, although the PTO sent Jordan a "Notice of Expired Patent" on February 26, 2003, he likewise failed to take action to restore the patent or even to notify SpringGuard that his error had caused its patent to lapse. A295-A296. SpringGuard itself never received either notice or any other communication from the PTO regarding its patent. A297.

SpringGuard would later discover that Jordan's neglect in its case was not an isolated occurrence. On December 9, 2002—more than a month before the '529 patent expired—the PTO removed Jordan from its official Register of Patent Attorneys and Agents, and he was not

reinstated until March 23, 2004.  *See* Declaration of Donald R. Steinberg in Support of Plaintiff's

Cross-Motion for Summary Judgment, Exs. 1-2 (hereinafter "Ex. __"); *see also* Compl. ¶¶ 34-35

& Exs. B-C.  Moreover, in 2006 the Massachusetts Board of Bar Overseers suspended Jordan

from practice because of his failure to cooperate in a disciplinary investigation.  A348-A352.

    Because of Jordan's actions, SprinGuard did not discover that the '529 patent had expired

until November 22, 2006.  Compl. ¶ 29; A295.  After retaining new counsel, SprinGuard filed a

petition to accept an unavoidably delayed payment less than three weeks later, on December 8,

2006.  A301.  The petition and accompanying declaration from inventors Moodie and Vinger

described SprinGuard's reliance on Jordan and his abandonment of the representation.  A304,

A294-A297.  SprinGuard's filings further explained that the company had reason to believe

Jordan's actions might have been due to serious illness or even death, but that it could not

provide definitive information because Jordan had not responded to numerous attempts to

contact him.  A304; *see* A296.

    The PTO dismissed SprinGuard's petition on March 12, 2007.  A320.  It first asserted

that SprinGuard was "bound by any errors that may have been committed by counsel."  A324.

In support of this rule, the PTO relied on *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962), which

upheld the dismissal of a suit for failure to prosecute based on the failure of the plaintiff's

counsel to appear at a pretrial conference.  *See* A324 n.19, A325 n.23.  Under *Link*, the PTO

reasoned, SprinGuard's reliance on its attorney "merely shift[ed] the focus of the inquiry from

[SprinGuard] to whether [Jordan] acted reasonably and prudently."  A324.  The PTO also

imposed a specific evidentiary requirement for any request for reconsideration:  "[A]ny showing

of unavoidable delay must include a statement from [Jordan] … as to why action was not taken

to timely submit the required maintenance fee."  A322-A323.  The PTO instructed SprinGuard to

send a letter to Jordan "by registered or certified mail" and to "submit a copy of such letter and the return receipt indicating its delivery." A323.

In response, SprinGuard made efforts to contact Jordan that far exceeded the PTO's requirements. As instructed, it sent him a letter by certified mail (which was eventually returned after it went unclaimed for more than a month). A343-A346. But SprinGuard also hired two private investigators, who determined that Jordan was still alive, verified his address and phone number, and checked his car registration. A337, A341, A348. SprinGuard then made repeated but unsuccessful attempts to contact Jordan by phone, fax, and personal visit. A337, A346.

SprinGuard brought all of these facts—along with its discovery that the Massachusetts Bar had suspended Jordan from the practice of law—to the PTO's attention in a request for reconsideration filed on May 11, 2007. A334. SprinGuard argued that Jordan's misconduct should not be attributed to it in the circumstances of this case. A337-A338. It further argued that it was inappropriate for the PTO to demand a showing of the actions that Jordan had taken to ensure timely payment of the maintenance fee. A335.

The PTO rejected these arguments and denied reconsideration on August 10, 2007. Rather than addressing—or even acknowledging—the extraordinary circumstances presented here, the PTO again mechanically applied a *per se* rule that a client always "must be held accountable" for its attorney's actions. A365. Indeed, the PTO simply repeated whole paragraphs of its initial decision verbatim. *Compare, e.g.*, A324-325 *with* A365. Although it conceded that SprinGuard had documented Jordan's refusal to be contacted despite diligent efforts, A363, the PTO stated, without explanation or justification, that SprinGuard could not

- 6 -

obtain relief without providing a declaration from Jordan showing "that counsel had docketed the patent for payment of the maintenance fee," A365.[1]

## ARGUMENT

The PTO's denial of a petition to accept a late payment of maintenance fees is reviewable under the APA.  *See Burandt v. Dudas*, 528 F.3d 1329, 1332 (Fed. Cir. 2008).  A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[2]  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  As explained below, the PTO's decision cannot withstand scrutiny under these standards.

---

[1]     SprinGuard also filed a petition to invoke the supervisory authority of the PTO Director. A368.  The PTO denied the petition on procedural grounds.  A394.  In other cases, however, the Office has been willing to accept what amount to second requests for reconsideration.  *See, e.g.*, *In re Patent No. 5,575,606* (Sept. 21, 2005) (Ex. 3); *In re Patent No. 5,455,569* (Mar. 4, 2003) (Ex. 4).  (Several of the PTO decisions cited in this brief are available only in the PTO's paper files.  Copies of these decisions and relevant supporting materials are submitted as exhibits to the Declaration of Donald R. Steinberg in support of this motion.)

[2]     Because the PTO does not dispute that its decisions here are reviewable under the APA, *see* Memorandum of Law in Support of Defendants' Motion To Dismiss or, in the Alternative, for Summary Judgment 9-10 (hereinafter "Mem."), the Court need not reach SprinGuard's alternative request for mandamus relief.

## I.     THE PTO'S IMPUTATION OF JORDAN'S CONDUCT TO SPRINGUARD WAS ARBITRARY AND CAPRICIOUS

As noted above, the PTO held that SprinGuard could not demonstrate "unavoidable" delay because under *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962), an attorney's acts and omissions must always be imputed to his client. *See* A324-A325, A365. The PTO's mechanical reliance on the *Link* rule was arbitrary and capricious for at least three reasons.

### A.     The PTO's Decision Was Inconsistent With Its Past Decisions Finding Unavoidable Delay In Cases Of Attorney Misconduct

The APA requires agencies to engage in "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. Among other things, this means that an agency must decide cases consistently or—if it chooses to change its policy—acknowledge and explain any departure from its past decisions. *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* ….").

In interpreting "unavoidable" delay in § 41(c)(1), however, the PTO has previously excused clients from the consequences of their lawyers' misconduct. In one recent case, the PTO found unavoidable delay where a patent holder's attorney failed to forward the required payment to the PTO, seemingly because he had been suspended from practicing before the PTO. *See In re Patent No. 6,160,836*, at 4 (Apr. 2, 2007) (Ex. 5). The PTO did not conclude that the patent holder was bound by his counsel's failure. Indeed, the PTO did not even cite *Link*. Similarly, in *In re Patent No. 5,455,569* (Mar. 4, 2003) (Ex. 4), the PTO found unavoidable delay where a lawyer billed his client for payment of maintenance fees but inexplicably failed to make the required payment. Once again, the PTO did not cite *Link* but rather concluded, without explanation, that "reasonable care was taken to ensure that the fee would be timely paid." And

in a third case, it appeared that counsel for the patent holder failed to pay the required fee

because counsel was bankrupt.  *See In re Patent No. 5,125,742* (Feb. 25, 1999) (Ex. 6).  Despite

having cashed the patent holder's check for the required fee, counsel did not inform the patent

holder of his failure to pay the fee.  Notwithstanding this misconduct by counsel, the PTO

granted the patent holder's petition for relief, again without even citing *Link*.

The circumstances of another recent case, *In re Patent No. 6,000,448* (Mar. 21, 2006)

(Ex. 7), are particularly analogous to the facts here.  In that case, as here, the petitioner relied on

counsel, was not informed by counsel of the need to pay the fees, and was unable to contact

counsel to obtain further information after the patent expired.  The entire explanation in the

petition for the delayed fee payment (as opposed to the delay in petitioning) was as follows:

> The patent * atty. I used to get this patent did not or could not
> reach me to inform me of any fees owed on this schedule.  I
> relocated at the end of 2001 to a different address.  I've attempted
> to contact him on several occasions without success.  He is not
> listed in any directory throughout the state of La.  I would have
> paid this or any fee had I been aware of one.  I worked 5 <u>hard</u> years
> to get that patent and I hate to think that a lack of communication
> could keep this product patent from being allowed.

*Id.*  The PTO granted this petition in a single sentence that nowhere cited the *Link* rule:  "In light

of the showing of record, it is concluded that the delay was unavoidable since reasonable care

was taken to ensure that the maintenance fee would be timely paid."  *Id.*

In this case, the PTO relied on an absolute rule that patent holders are bound by the

"mistakes or negligence of their voluntarily chosen representatives."  A365.  That rule, however,

would have precluded relief in each of the four cases cited above.  And the PTO's failure to

acknowledge—much less explain—this inconsistency renders its action arbitrary and capricious.

*See Massachusetts Dep't of Educ. v. United States Dep't of Educ.*, 837 F.2d 536, 544 (1st Cir.

- 9 -

1988) ("[A]gencies have an obligation to render consistent opinions and to either follow,

distinguish, or overrule their own earlier pronouncements." (internal quotation marks omitted)).[3]

### B.    The PTO's Failure Even To Consider An Exception To The *Link* Rule Was Arbitrary And Capricious

The PTO failed even to consider making an exception to the *Link* rule in this case—much

less to explain why an exception was unwarranted.  Even setting aside the PTO's departure from

precedent, this failure of explanation was arbitrary and capricious for at least three reasons.

*First*, the PTO was obligated to consider recognizing a "gross negligence" exception to

the *Link* rule—as a majority of the courts have done in an analogous situation—because such an

exception is a viable policy alternative.  Agency action is arbitrary and capricious if the agency

"entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*, 463

U.S. at 43.  In order to fulfill its obligation to consider all important aspects of a problem, an

agency must consider—and explain the reasons for rejecting—"viable alternative[s]" to its

chosen policy.  *NLRB v. Beverly Enterprises-Massachusetts, Inc.*, 174 F.3d 13, 23 (1st Cir.

1999); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50-51; *Laclede Gas Co. v. FERC*, 873

F.2d 1494, 1498 (D.C. Cir. 1989).

---

[3]    It is also troubling that the PTO's publication practices erect an obstacle to parties seeking to challenge the Office's decisions as inconsistent by making decisions *granting* relief under § 41(c)(1) far harder to identify and access than decisions *denying* relief. Lexis, Westlaw, and the PTO's own website include more than 500 decisions interpreting § 41(c)(1) and the related "unavoidable" delay standard in 35 U.S.C. § 133.  *See* http://www.uspto.gov/web/offices/ com/sol/foia/comm/comm.htm (last visited June 11, 2009).  After reviewing all of these "published" decisions, counsel identified *only 5* decisions finding "unavoidable" delay, the most recent of which was decided in 1990.  In response to a FOIA request, however, the PTO disclosed a list identifying approximately 1,450 instances in which the PTO has granted relief under the "unavoidable" or "unintentional" delay standards of 35 U.S.C. §§ 41(c)(1), 133, 151, or 364(b).  The PTO claimed not to be able to separate out the decisions applying § 41(c)(1). Nonetheless, counsel determined that the list included *at least 250* decisions finding unavoidable delay under § 41(c)(1), including the four decisions cited above.  These "unpublished" decisions are available only in the PTO's paper patent files.

In this case, the PTO was presented with precisely the sort of "viable alternative" that demands consideration and explanation:  Rather than applying a *per se* rule that a client is always bound by its attorney's errors, the PTO could have recognized an exception to the *Link* rule for the rare cases in which an attorney's actions constitute not mere negligence, but rather *gross* negligence or the complete abandonment of the attorney-client relationship.  As the Ninth Circuit has explained, *Link* describes "the general rule regarding the attorney-client relationship," but there is a difference between "a client's accountability for his counsel's neglectful or negligent acts—too often a normal part of representation—and his responsibility for the more unusual circumstance of his attorney's extreme negligence or egregious conduct."  *Community Dental Servs. v. Tani*, 282 F.3d 1164, 1168 (9th Cir. 2002).  Accordingly, numerous courts, including the District of Massachusetts, have recognized a "gross negligence" exception to the *Link* rule, holding that extreme attorney misconduct—as distinct from ordinary negligence—may be grounds for relief from a judgment under Federal Rule of Civil Procedure 60(b)(6).[4]

Jordan's abandonment of SprinGuard without notice is a paradigmatic example of the sort of conduct that courts have found sufficiently egregious to trigger this exception.  *See, e.g.*, *Community Dental Servs.*, 282 F.3d at 1171 (attorney "abandoned his duties as an attorney and

---

[4]     *See, e.g.*, *Community Dental Servs.*, 282 F.3d at 1169; *Fuller v. Quire*, 916 F.2d 358, 359-361 (6th Cir. 1990); *Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 807-808 (3d Cir. 1986); *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981); *Boughner v. Secretary of Health, Educ. & Welfare*, 572 F.2d 976, 978 (3d Cir. 1978); *L.P. Steuart, Inc. v. Matthews*, 329 F.2d 234, 235 (D.C. Cir. 1964); *Brooks v. Walker*, 82 F.R.D. 95, 97 (D. Mass. 1979).  The First Circuit has not taken a position on this issue.  The PTO quotes a snippet of that court's opinion in *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1 (1st Cir. 2003), in an effort to suggest that it has endorsed a *per se* rule that a client must always be held accountable for its attorney's errors.  *See* Mem. 13.  The full context of the quoted language, however, shows that the First Circuit expressly reserved judgment on the question "whether to make an exception" to the *Link* rule when an attorney's actions rise to the level of "gross negligence."  *KPS*, 318 F.3d at 16.

agent").[5]  Indeed, even the PTO's counsel now appears to concede that Jordan's actions

constituted "gross negligence."  Mem. 12.  The PTO, however, refused even to *consider* the

possibility of an exception to the *Link* rule.  That failure was arbitrary and capricious.[6]

 *Second*, the PTO's refusal to consider an exception to the *Link* rule was also arbitrary and

capricious because the PTO *itself* has previously made an exception in the context of a decision

on "unavoidable" delay under § 133.[7]  In *In re Lonardo*, 17 U.S.P.Q.2d 1455 (Comm'r Pat. &

Trademarks 1990), the PTO cited *Link* for the proposition that "one is *ordinarily* bound by the

acts of his attorney," *id.* at 1455 (emphasis added), but went on to recognize an exception to the

general rule.  The PTO cited a number of court cases holding that "[w]hen an attorney

intentionally conceals a mistake he has made … the situation is not governed by the stated rule in

*Link* for charging the attorney's mistake to his client."  *Id.* at 1458.  Finding this exception met,

the PTO concluded that the petitioner was not responsible for his attorney's negligence.  *See id.*

at 1461.  The PTO continues to rely on *Lonardo*.  *See* A366 n.21 (citing *Lonardo*).

 Having adopted an exception to the *Link* rule in *Lonardo*, the PTO was obligated to

provide some explanation for its refusal to make an exception here—particularly because a gross

negligence exception, like the concealment exception adopted in *Lonardo*, has been endorsed by

numerous courts.  As the D.C. Circuit has explained, "[o]nce an agency agrees to allow

---

[5] *See also, e.g.*, *Boughner*, 572 F.2d at 977 (lawyer's conduct "amounted to nothing short of leaving his clients unrepresented"); *Seven Elves*, 635 F.2d at 403 (lawyer effectively "'withdrew' from the case without being relieved as attorney of record or informing the [clients] of his withdrawal"); *Associated Marine Equip. LLC v. Jones*, 301 Fed. Appx. 346, 350 (5th Cir. 2008) (lawyer "abandoned [the client] without his knowledge").

[6] A few courts have rejected the "gross negligence" exception to the *Link* rule, at least in the context of Rule 60(b)(6).  But that fact cannot excuse the PTO from even considering the obviously "viable" alternative of following the majority rule and recognizing an exception.

[7] The PTO has held that "unavoidable" delay has the same meaning in both provisions and routinely relies on precedents interpreting § 133 in construing § 41(c)(1).  *See, e.g.*, A362.

exceptions to a rule, it must provide a rational explanation if it later refuses to allow exceptions in cases that appear similar." *Hooper v. NTSB*, 841 F.2d 1150, 1151 (D.C. Cir. 1988) (brackets and internal quotation marks omitted)); *see also, e.g.*, *Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 337 (D.C. Cir. 1985) (same); *New York State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 146 (D.D.C. 2003) (same); *Gas Transmission Nw. Corp. v. FERC*, 363 F.3d 500, 503 (D.C. Cir. 2004) (once an agency has granted waiver of a rule in one case, "it cannot rest its refusal of [a different] waiver request simply on the underlying justification for its general [rule]"). In this case, however, the PTO failed to provide any explanation whatsoever for its refusal to make an exception to the *Link* rule.

*Third*, the PTO's refusal to consider whether to recognize a gross negligence exception was arbitrary and capricious because the PTO had previously stated that the propriety of such an exception was an unsettled issue. When an agency is confronted with "an open question," its decision cannot be affirmed if it "provides … no explanation of its thinking with regard to the issue." *Kelley v. Merit Sys. Prot. Bd.*, 241 F.3d 1368, 1370 (Fed. Cir. 2001); *see also Florida Mun. Power Agency v. FERC*, 411 F.3d 287, 288 (D.C. Cir. 2005) (when an agency's past actions have "left open the possibility of exceptions" to a general rule, a subsequent "refusal to consider" whether the facts of a particular case "provide[] a proper basis for an exception" is "arbitrary and capricious"). In *Lonardo*, the PTO noted that "some courts have not broadly applied *Link*'s rule that an attorney's conduct is chargeable to his client, when the conduct is deemed to involve gross-negligence rather than ordinary negligence." 17 U.S.P.Q.2d at 1458. The PTO observed that it had not previously distinguished between gross negligence and ordinary negligence, but then expressly left open the possibility of a gross negligence exception, explaining that "whether such a distinction is proper need not be decided" because the petitioner

in *Lonardo* was entitled to relief on the basis of his attorney's concealment alone. *Id.* In this case, however, the PTO treated as closed the very question that it had expressly left open in *Lonardo*, and it did so without any explanation. That was arbitrary and capricious.

### C.    It Was Arbitrary And Capricious Not To Recognize An Exception To The *Link* Rule In The Circumstances Of This Case

The foregoing arguments demonstrate that the PTO's decision cannot stand because it failed adequately to explain its refusal to adopt an exception to the *Link* rule. But that failure is unsurprising, because the PTO's refusal to make an exception in this case cannot be defended. Thus, even apart from the deficiencies in its explanation, the PTO's decision must be vacated.

For decades, courts have interpreted the "unavoidable" standard in 35 U.S.C. § 133—which governs the revival of abandoned patent applications—to call for a flexible, equitable inquiry: "[T]he question of whether an applicant's delay in prosecuting an application was unavoidable must be decided on a case-by-case basis, taking all of the facts and circumstances into account." *Smith v. Mossinghoff*, 671 F.2d 533, 538 (D.C. Cir. 1982). By adopting the same term in § 41(c)(1), Congress codified this broad equitable test. *See Ray v. Lehman*, 55 F.3d 606, 609 (Fed. Cir. 1995); A362 & nn. 5, 7. But a *per se* rule that a client is *always* responsible for its attorney's conduct cannot be reconciled with this "case-by-case" approach because it precludes the consideration of any other facts. To be faithful to congressional intent, then, the PTO must grant exceptions to the *Link* rule in appropriate circumstances.

One such circumstance is gross negligence or abandonment by an attorney. As explained above, even in the context of the strict "exceptional circumstances that justify extraordinary relief" standard of Rule 60(b)(6), *see United States v. 6 Fox Street*, 480 F.3d 38, 46 (1st Cir. 2007) (internal quotation marks omitted), the clear majority of courts to consider the question have held that an attorney's gross negligence or abandonment justifies relief from a final

- 14 -

judgment.  It necessarily follows that the same circumstances justify relief under the more

generous equitable inquiry prescribed in § 41(c)(1).[8]

This conclusion is not altered by any of the cases cited by the PTO's counsel.  *See* Mem.

12-14.  It is true that some of those cases held that an attorney's errors did not constitute

"unavoidable" delay.  *See, e.g.*, *Douglas v. Manbeck*, 21 U.S.P.Q.2d 1697 (E.D. Pa. 1991), *aff'd*,

1992 WL 162547 (Fed. Cir. 1992).  But none of those cases even considered the possibility of an

exception to the *Link* rule based on abandonment or gross negligence because none of them even

arguably involved such extreme attorney misconduct.

Moreover, it would be particularly inappropriate to hold SprinGuard accountable for

Jordan's actions in this case because the PTO itself removed Jordan from the list of registered

patent attorneys before the patent expired.  *See* Exs. 1-2; *see also* Compl. ¶¶ 34-35 & Exs. B-C.[9]

The PTO urges the court to give this fact no weight on the ground that a person need not be a

registered patent attorney in order to pay a maintenance fee.  Mem. 16-17 (citing 37 C.F.R.

§ 1.366(a)).  But the issue is not whether Jordan *could* have made the payment.  Rather, the

---

[8]     The PTO asserts that because inventions fall into the public domain when patents lapse,
public policy disfavors reinstatement.  Mem. 8.  But any public policy concerns are mitigated by
§ 41(c)(2), which prevents the holder of a reinstated patent from enforcing the patent against
members of the public who detrimentally relied on the patent's expiration.

[9]     The PTO contends that this Court may not consider its removal of Jordan from the
Register of Patent Attorneys and Agents because SprinGuard did not submit the notices
reflecting that removal during administrative proceedings.  Mem. 16.  But the notices on which
SprinGuard seeks to rely are public documents issued by the PTO itself.  Courts routinely take
judicial notice of an agency's own records and publications even if they were not introduced in
proceedings before the agency.  *See, e.g.*, *Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir.
2003) ("Although the administrative record does not contain these facts, we take judicial notice
of the information on the EPA's database."); *Lising v. INS*, 124 F.3d 996, 998 (9th Cir. 1997)
(court may take "judicial notice" of "the agency's own records").  This Court should do so here.
Moreover, contrary to the PTO's assertion, Mem. 16, SprinGuard does not seek to use the fact of
Jordan's removal from the list of registered attorneys to support a new argument not presented
before the PTO.  Rather, it simply argues that Jordan's suspension provides further support for
its claim that Jordan's conduct should not be imputed to SprinGuard.

question is whether SprinGuard should be penalized for Jordan's apparent misconduct in failing to do so. In that respect, Jordan's suspension from the list of registered attorneys is not, as the PTO would now have it, a mere administrative matter. To the contrary, under the PTO's own rules, removal from the list of registered patent attorneys renders ineffective any powers of attorney granted to the removed lawyer. *See* Manual of Patent Examining Procedure § 407 ("Any power of attorney given to a practitioner who has been suspended or disbarred by the Office is ineffective…."). Therefore, when SprinGuard's patent lapsed due to Jordan's failure to pay the required fee—and when the PTO sent notice of that lapse *to Jordan* (*see* A295)—Jordan was not, in fact, serving as SprinGuard's legal representative in the PTO.

This fact is significant because the *Link* rule is predicated on the special nature of the attorney-client relationship. *See Link*, 370 U.S. at 634. Therefore, if the PTO would not have recognized Jordan as SprinGuard's attorney, the rationale for holding SprinGuard accountable for his actions disappears. Indeed, the PTO has previously relied on the fact that an attorney was suspended from practice before the Office in holding that the attorney's failure to pay maintenance fees was not attributable to his client. *See In re Patent No. 6,160,836*, at 4 (Apr. 2, 2007) (Ex. 5) ("Given the facts and circumstances of this case, *in particular the suspension of petitioner's prior attorney*, it is concluded that petitioner has established that the delayed payment of the maintenance fee was unavoidable." (emphasis added)). Contrary to the PTO's contention (Mem. 15-16 n.5), the basis for Jordan's removal from the list of registered attorneys is beside the point. What matters is that Jordan was not acting as SprinGuard's lawyer at the relevant time—when the patent expired and the PTO sent the notice of that expiration to Jordan, but not to SprinGuard.

## II.     THE PTO'S IMPOSITION OF AN INSURMOUNTABLE EVIDENTIARY BURDEN WAS ARBITRARY AND CAPRICIOUS

Although the PTO acknowledged that SpringGuard went to great lengths to try to locate Jordan (A363-A364), it nonetheless demanded a declaration from Jordan showing that he "had docketed the patent for payment of the maintenance fee" (A365). In light of Jordan's refusal to communicate with SpringGuard, the PTO's evidentiary demand amounted to an insurmountable barrier to relief. And the same barrier will apparently apply in every case where circumstances beyond a petitioner's control prevent it from obtaining information about the conduct of one of its agents related to the payment of a maintenance fee. It is impossible to square such a rule with § 41(c)(1)'s purpose of avoiding the "inequitable loss of patent rights," or with *Smith*'s instructions to take "all of the facts and circumstances into account."

Indeed, the PTO's only substantive response to SpringGuard's arguments regarding Jordan's refusal to communicate was utterly confused. The PTO's initial and final decisions simply repeated the assertion that "delay resulting from a lack of proper communication between a patent holder and a registered representative as to who bore the responsibility for payment of a maintenance fee does not constitute unavoidable delay." A324; *see* A365 (same). But in this case, the "lack of proper communication" between SpringGuard and Jordan had nothing to do with "who bore the responsibility for payment of a maintenance fee"—there is no question that Jordan was responsible. *See infra* § III. Rather, the "lack of proper communication" arose only *after* the fact, when Jordan refused to cooperate with SpringGuard's investigation. The PTO thus wholly failed to address the evidentiary problems created by this sort of post-lapse lack of communication. This alone was arbitrary and capricious. *See PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("An agency's failure to respond meaningfully to

- 17 -

objections raised by a party renders its decision arbitrary and capricious." (internal quotation marks omitted)); *see also, e.g.*, *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997) (same).

The PTO's decision was also inconsistent with the Office's past decisions finding unavoidable delay notwithstanding the fact that the actors with firsthand knowledge of the failure to pay maintenance fees could not be located. For example, in one case a party claimed that the failure to pay maintenance fees was due to a docketing error by one of two paralegals. The PTO initially demanded affidavits from the paralegals, but later granted relief after the petitioner explained that the paralegals could not be located. *See In re Patent No. 5,575,606* (Sept. 21, 2005) (Ex. 3). Even more striking, in one of the decisions involving lawyer misconduct discussed above, the PTO granted relief based on a petitioner's bare assertion that his attorney had failed to pay the required fees and that he had attempted to contact the attorney on several occasions without success. *See In re Patent No. 6,000,448* (Mar. 21, 2006) (Ex. 7). As the block quotation of the petition in that case demonstrates (*see supra* p.9), the patent holder provided absolutely no information about whether his lawyer had a "docketing system"—or any system— for tracking maintenance fees. Indeed, the patent holder provided no information whatsoever regarding why his attorney failed to pay the requisite fee. Yet, the PTO granted relief. Once again, the agency's unexplained departure from precedent renders its action arbitrary and capricious. *See Fox Television Stations, Inc.*, 129 S. Ct. at 1811.

## III.   ANY SUGGESTION THAT SPRINGUARD ITSELF WAS NOT DILIGENT MUST BE REJECTED

The PTO's motion to dismiss suggests that even if Attorney Jordan's actions were not imputed to SprinGuard, the company still would not be entitled to relief because of its *own* failure to check on the status of its patent. Mem. 13. But in its final decision, the PTO stated that a patent holder can satisfy its obligation to exercise diligence "by either obligating a third

party to track and pay the fee, or by itself assuming the obligation to track and pay the fee."

A366. This was consistent with case law holding that a party may reasonably rely on patent

counsel to track the required maintenance fees.[10] The principal case relied on by the PTO in its

motion—*Douglas v. Manbeck*, 21 U.S.P.Q.2d 1697 (E.D. Pa. 1991)—is not to the contrary. In

that case, the court held that a patent applicant could not show unavoidable delay under 35

U.S.C. § 133 because the applicant failed to make any inquiry into the status of his patent

application for two and a half years, despite being aware of his attorney's death. *See* 21

U.S.P.Q.2d at 1699-1700. In this case, in contrast, SprinGuard had no knowledge that Jordan

had effectively ceased the practice of law. And, unlike a patent applicant who would have

reason to expect some progress on his application over the course of more than two years,

SprinGuard had no reason to think that anything was amiss: It expected that Jordan would take

all steps necessary to maintain its patent and had no reason to think that he had failed to do so

until it discovered the lapse in November 2006.[11] Once SprinGuard discovered the lapse, it

unquestionably acted with diligence in investigating the circumstances of the lapse and filing a

petition with the PTO less than three weeks later.[12]

---

[10]    *See California Med. Prods., Inc. v. Tecnol Med. Prods., Inc.*, 921 F. Supp. 1219, 1259 (D. Del. 1995) (a party not "obliged to take independent steps to track the maintenance fee due date just because [his lawyer] might …die[] or stop[] practicing law"); *see also R.R. Donnelley & Sons Co. v. Dickinson*, 123 F. Supp. 2d 456, 460 (N.D. Ill. 2000) (rejecting reliance on a law firm because it had not been retained by the patent owner).

[11]    *See Lonardo*, 17 U.S.P.Q.2d at 1457 (holding that a patent holder acted with diligence despite his failure to investigate the details of his patent application for *thirteen years* because "the record shows no reason for [the patent holder] to question the status of the … application").

[12]    The PTO also relies on *Millman v. USPTO*, 257 Fed. Appx. 307 (Fed Cir. 2007). But in that case, it was the patentee, not the lawyer, that had responsibility for paying the maintenance fee, and the patentee had been told of the need to pay the fees. *See id.* at 308, 310. Moreover, the PTO and the court focused primarily on the patentee's lack of diligence after he fired his attorney. *See id.* at 309-310.

Finally, the PTO's motion also asserts—in a single sentence—that SprinGuard "could not have had any explicit understanding with Jordan that Jordan would be responsible" for the payment of maintenance fees because it "was not aware of the necessity of paying maintenance fees." Mem. 14. But this *post hoc* argument is a *non sequitur*:  SprinGuard was not specifically aware of the obligation to pay maintenance fees, but the record demonstrates that Jordan was obligated to take *all* steps required to maintain the '529 patent, including the payment of maintenance fees. *See California Med. Prods., Inc.*, 921 F. Supp. at 1259 (agreement explicitly referencing fees not required).  In all of its filings before the PTO, SprinGuard indicated that Jordan was responsible for taking all actions necessary to secure and maintain the patent.  A295 & A297, A335-A336.  Nothing in the record contradicts this representation.  To the contrary, every objective indication confirms it:  Jordan's power of attorney expressly authorized him to "transact *all* business in the Patent and Trademark Office connected" to the '529 patent—a scope of authority that unquestionably includes maintenance fees.  A041 (emphasis added).  Moreover, when the PTO issued a notice of allowance, Jordan paid the issue fee and signed a form stating that his address continued to be the "Correspondence Address" and declining to specify a separate "Fee Address."  A293.

In short, it is clear that SprinGuard retained counsel to ensure the maintenance of its patent and that SprinGuard itself acted with all reasonable diligence thereafter.  As a result, the only way SprinGuard can be held responsible for the late maintenance payment is if it is deemed bound by the failures of its attorney.  And for all of the reasons set forth above, the PTO's determination that SprinGuard is so bound should be set aside as arbitrary and capricious.

## CONCLUSION

SprinGuard respectfully requests that the Court grant its Cross-Motion for Summary Judgment and deny the PTO's Motion To Dismiss or, in the Alternative, for Summary Judgment.

Date:  June 12, 2009                                Respectfully submitted,


                                                    /s/ Donald R. Steinberg
                                                    Donald R. Steinberg (BBO #553699)
                                                    Donna M. Meuth (BBO #645598)
                                                    Wilmer Cutler Pickering Hale and Dorr LLP
                                                    60 State Street
                                                    Boston, MA 02109
                                                    (617) 526-6000
                                                    (617) 526-5000 (fax)

                                                    Brian M. Boynton (*pro hac vice*)
                                                    Wilmer Cutler Pickering Hale and Dorr LLP
                                                    1875 Pennsylvania Avenue, NW
                                                    Washington, DC 20006
                                                    (202) 663-6000
                                                    (202) 663-6363 (fax)

                                                    *Attorneys for Plaintiff*
                                                    *SprinGuard Technology Group Inc.*

**CERTIFICATE OF SERVICE**

I, Donald R. Steinberg, hereby certify that on this 12th day of June, 2009, this document, filed through the ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing.

/s/ Donald R. Steinberg
Donald R. Steinberg